# IN THE SUPREME COURT OF IOWA

No. 10–0335

Filed April 6, 2012

**STATE OF IOWA,**

Appellee,

vs.

**ANTHONY DEVON POLK,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Thomas N. Bower, Judge.

Defendant appeals denial of motion to suppress confession. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED; CASE REMANDED FOR NEW TRIAL.**

Mark C. Smith, State Appellate Defender, and David Arthur Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson and Richard J. Bennett, Assistant Attorneys General, Thomas J. Ferguson, County Attorney, and Joel A. Dalrymple, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

Defendant, Anthony Devon Polk, confessed in a jailhouse interview to firing his handgun at the scene of a gang-related shooting that left two men with gunshot wounds. We must decide whether the interrogating police officer's tactics rendered Polk's confession inadmissible. Polk contends the officer baited him into talking after Polk had invoked his Fifth Amendment right to remain silent and made improper promises of leniency that suggested by talking to police Polk could get a better deal and spend less time away from his children.

The district court denied Polk's motion to suppress his confession and convicted him on charges of intimidation with a dangerous weapon in violation of Iowa Code section 708.6 (2009), going armed with intent in violation of section 708.8, and carrying a weapon in violation of section 724.4(1). Polk was sentenced to ten-year, five-year, and two-year concurrent prison terms for those convictions. The court of appeals affirmed Polk's convictions but found the officer came "dangerously close to the line" when eliciting Polk's confession. We conclude the officer crossed the line with promises of leniency. We hold Polk's confession was inadmissible for that reason and, therefore, do not decide whether Polk was in custody for *Miranda* purposes or whether his right to remain silent was violated.

We vacate the court of appeals decision, reverse Polk's convictions and sentences, and remand the case for a new trial.

**I. Background Facts and Proceedings.**

Polk, age twenty-two, and his friend, Devin Pendleton, "got into it" with Treyvon Henley during Waterloo's Fourth of July fireworks celebration in 2008. Henley, also known as "Stix," was associated with the Chopper City gang based near Sumner and Manson Streets. Henley

pulled a revolver on Pendleton in front of a liquor store and fired a shot at him. Later that night, Polk and Pendleton, both armed, returned to the area of Sumner and Manson Streets looking for Henley. About 2 a.m., they spotted Henley drinking outside with two other men, Dontrell Hoskins and Willie Evans. Pendleton and Polk both fired shots at Henley. The bullets missed their target but struck Hoskins in the back and grazed Evans' left forearm. Evans later identified Polk from an array of photographs.

On July 30, Polk was held in the Black Hawk County jail on an unrelated arrest warrant. Officer Shawn Monroe questioned Polk there about the shooting. Inmates are housed in pods on the jail's second and third floors. Polk's questioning took place in a designated interview room on the first floor. The room is small, approximately four- to six-feet wide and eight-feet deep. Monroe audio recorded the interrogation using a small digital recorder. Whether Polk was in custody for *Miranda* purposes is disputed. *See generally Howes v. Fields*, ___ U.S. ___, 132 S. Ct. 1181, ___ L. Ed. 2d ___ (2012) (addressing whether prison interview is custodial for *Miranda* purposes); *State v. Pearson*, 804 N.W.2d 260, 268 (Iowa 2011) ("When an inmate is questioned, we look for 'some added restriction on the inmate's freedom of movement stemming from the interrogation itself.'" (quoting *State v. Deases*, 518 N.W.2d. 784, 789 (Iowa 1994))).

Monroe began by advising Polk he was "in custody" and read him his *Miranda* rights. He informed Polk he wanted "to talk about some of the stuff that has been going on in Waterloo" and that Polk's name "has been brought up in a couple of things." Monroe asked Polk about his association with Pendleton and gangs. Monroe told Polk "somebody says you shot somebody." Claiming he "did not have a gun to shoot anybody

with," Polk denied the accusation. Monroe followed up by asking Polk why he was found in a house near two guns, one ten feet from him. Polk continued to deny he shot anyone, raising his voice, "I ain't shoot nobody, I ain't got nothing to say, can I go back to my [jail] pod?" Monroe responded, "Well if you don't want to know what happens from here on out, yeah you can." Polk asked Monroe "what happens?"

Monroe explained that "what happens from here can be influenced by what we talk about." Monroe continued, "Let me just lay it out for you like this okay, it has been my experience working cases like this, that if somebody cooperates with us, on down the road the county attorney is more likely to work with them." Polk asked, "What's the county attorney?" Monroe informed Polk that the county attorney has discretion as to "how much time somebody does if they are found guilty or the one that cuts a deal." Monroe continued:

> [County attorneys] are much more likely to work with an individual who is cooperating with police than somebody who sits here and says I didn't do it, I don't know what is going on. What we can talk about now can influence and has the potential to influence things that happen on down the road.

At this point, Polk again attempted to end the questioning stating, "I want to go back to my cell, I didn't do it, can I go?" Monroe answered, "You are free to go, the door's right there. If that's what you want to do." Polk stood up, left the interview room, and walked down the hall toward the elevator to the jail pods. Monroe stepped to the doorway of the interview room and said, "Hey Anthony, I do want to tell you I got paperwork down here charging you with possession of a firearm and going armed with intent." Polk asked Monroe, "How did I get charged with a firearm?" Monroe told Polk, "We can talk about it . . . but you want to go back to your cell or we can talk? You can make the decision

now . . . ." Polk returned to the interview room. Monroe asked Polk to answer in the affirmative that he returned voluntarily to learn "what is going on," which Polk did.

Monroe then resumed his interrogation of Polk:

> I'm telling you, you need to start thinking about what you are going to do for yourself because I know you got a couple of kids out there and *I'd hate to see the kids miss their daddy for a long time because you didn't want to talk about what's going on, that you wanted to keep this I don't know what's up.*
>
> . . . .
>
> If you want keep your story, I'll tell you what, later on down the line nobody is going to be that willing to work with you. But if you are thinking I want to cop a plea, and I want *to get the best plea possible, one of the things that can help you with that, possibly help you with that, is that you are cooperating now.*

(Emphasis added.)

Monroe told Polk he had an eyewitness stating Polk was with Pendleton, the color shirts each were wearing, and from what direction they approached the house. Monroe continued:

> Obviously, I'm only getting one side of the story and there is probably more to it. But the only person that is going to be able to tell me that is you. If you want to talk about this we can talk about this. Like I said, you need to start thinking what is best for you. You got to quit thinking about [Pendleton] . . . you got to start thinking about what's best for you.

Monroe then mentioned Polk's children again:

> Man if you don't want to do this for you, do this for your kids. They need their dad around. [35-second pause] Just don't forget you got kids that are depending on you. They need their pops around. And you got to think about yourself, what's good for you right now.

Polk promptly admitted he went to the Sumner and Manson Streets area on July 5 with Pendleton, carrying a firearm with the intent to shoot Henley, and that he fired shots at Henley there.

On August 1, the county attorney charged Polk by trial information with intimidation with a weapon, going armed with intent, and carrying weapons. Polk filed a motion to suppress his confession. The motion alleged Monroe procured his confession in violation of his Fifth Amendment privilege against self-incrimination, his Sixth Amendment right to counsel, and through improper promises of leniency. The district court denied Polk's motion to suppress. The district court concluded Monroe's "[s]tatements indicating that it would be in [Polk's] best interests and that of his family [for Polk] to tell the truth . . . [do] not make [Polk's] statements inadmissible."

Polk also challenged his competency to stand trial. A psychologist, Dr. Carroll Roland, was retained by the defense. Dr. Rowland had measured Polk's IQ at fifty-nine two years earlier when evaluating Polk as incompetent to stand trial on a 2006 charge. Dr. Rowland interviewed Polk twice in October and concluded that Polk "is not *currently* competent to stand trial." Dr. Rowland concluded Polk functions in the "mild range of mental retardation" and, in his opinion, "did not understand his *Miranda* rights when they were read by the arresting officer." Experts for the State measured Polk's IQ at sixty-four and seventy-one, respectively, and found him competent to stand trial. The district court ruled Polk was competent, but stated "it may be necessary that court proceedings be slowed down somewhat to give defendant an opportunity to fully comprehend the events as they occur in the courtroom."

The case was tried to the court on minutes of testimony. The district court convicted Polk on all three charges, relying on Polk's confession he went armed to the Sumner and Manson Streets area. The district court relied on Polk's "admissions and the testimony of the other

witnesses." Polk was sentenced to ten-year, five-year, and two-year prison terms to be served concurrently.

Polk appealed, arguing his confession was procured in violation of his *Miranda* rights and through promises of leniency. The court of appeals affirmed the district court's denial of Polk's suppression motion. The court of appeals found Polk was not "in custody" for *Miranda* purposes. On the promise-of-leniency issue, the court of appeals found "the officer is dangerously close to the line, but these statements do not make Polk's confession involuntary."

We granted Polk's application for further review.

## II. Scope of Review.

We review de novo Polk's constitutional challenges to the admissibility of his confession. *Pearson*, 804 N.W.2d at 265. We review for correction of errors at law the district court's ruling on promises of leniency under the common law evidentiary test, when "there is no dispute as to the words used" or their meaning under the circumstances. *State v. Mullin*, 249 Iowa 10, 15, 85 N.W.2d 598, 601 (1957) (court to determine promise-of-leniency issue as a matter of law).

## III. The Promise-of-Leniency Issue.

"[I]t is obvious that confession evidence is of great importance in a criminal trial." *State v. LaDouceur*, 366 N.W.2d 174, 177 (Iowa 1985). " 'Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' " *Pearson*, 804 N.W.2d at 266 (quoting *Maryland v. Shatzer*, 559 U.S. ___, ___, 130 S. Ct. 1213, 1222, 175 L. Ed. 2d 1045, 1055 (2010)) (internal quotation marks omitted). But, we have long recognized promises of leniency create the risk of a false confession

leading to a wrongful conviction. *See Mullin*, 249 Iowa at 16, 85 N.W.2d at 601. Specifically, we have recognized such promises "may very well destroy the voluntary nature of the confession in the eyes of the law." *Id.* at 16, 85 N.W.2d at 602 (quoting 3 *Wigmore on Evidence* §§ 823–24 (3d ed. 1940)).

Accordingly, we have reiterated that a " 'confession can never be received in evidence where the prisoner has been influenced by any threat or promise.' " *State v. McCoy*, 692 N.W.2d 6, 27 (Iowa 2005) (quoting *Mullin*, 249 Iowa at 14, 85 N.W.2d at 600)). The rule suppressing confessions tainted by promises of leniency deters police from using a tactic that might induce the innocent to confess falsely. *See* 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.2(b), at 612–13 (3d ed. 2007) (noting the "exclusionary rule for confessions . . . is also intended to deter improper police conduct").

**A. The Common Law Test for Reviewing Promise-of-Leniency Challenges.** We review challenges to confessions based on a promise of leniency under a common law evidentiary test. *McCoy*, 692 N.W.2d at 27–28. The defendant's confession is to be suppressed if it follows the officer's improper promise of leniency. *Id.* We have adopted this exclusionary rule out of concern that " 'the law cannot measure the force of the influence used, or decide upon its effect upon the mind.' " *Id.* at 27 (quoting *Mullin*, 249 Iowa at 14, 85 N.W.2d at 600)). The exclusionary rule eliminates the need for the court to attempt to read the mind of the defendant to determine if his confession in fact was induced by or made in reliance upon the promise of leniency.

**B. Precedent Defining an Improper Promise of Leniency**. "An officer can tell a defendant that it is better to tell the truth without crossing the line between admissible and inadmissible statements from

the defendant." *Id.* at 28. Our cases, however, prohibit the investigator from communicating to defendants that an advantage is to be gained by making a confession. *See, e.g., id.* (The line between admissibility and exclusion seems to be crossed " 'if the officer . . . tells the suspect what advantage is to be gained or is likely from making a confession.' " (citation omitted)).

In *State v. Whitsel*, we held the defendant's confession was admissible when the officers stopped short of indicating his cooperation would likely result in less severe punishment. 339 N.W.2d 149, 153 (Iowa 1983). We summarized the facts as follows:

> During the course of questioning, Whitsel volunteered information concerning his prior arrest on a sexual abuse charge . . . . In response to this statement offered by Whitsel, the detectives told Whitsel that they would recommend to the county attorney that Whitsel receive psychiatric help and tell the county attorney of his cooperation. They emphasized, however, that they could not make any promises or give any guarantees and would only relate to the county attorney what had been said. Whitsel then made his confession following this exchange.

*Id.* An offer to inform the county attorney of the defendant's cooperation, without any further assurances, is not improper. *Id.*

By contrast, we have held officers impermissibly promise leniency when they make "suggestion[s] . . . defendant would receive better treatment and less severe punishment" if he confesses. *State v. Hodges*, 326 N.W.2d 345, 346 (Iowa 1982). In *Hodges*, the officer told the defendant "there was a much better chance of him receiving a lesser offense than first degree murder" if he talked. *Id.* at 349 (emphasis omitted). In *State v. Kase*, we held an investigator crossed the line by telling defendant "that if she told him what she knew about Vaughn's death and signed a consent to search her apartment no criminal charges would be filed against her; otherwise, she was told, she would be charged

with murder." 344 N.W.2d 223, 226 (Iowa 1984). In *State v. Quintero*, we held the police utilized improper threats by suggesting to defendant that if he did not tell the truth "he would anger the judge and jury and suffer greater punishment." 480 N.W.2d 50, 50–51 (Iowa 1992). In *McCoy*, we found the officer improperly promised leniency by telling the defendant twenty-five times that "if he didn't pull the trigger he would not be in any trouble." 692 N.W.2d at 28.

**C. Application of Precedent.** After three minutes of questioning, Polk said, "I ain't got nothing to say. Can I go back to my pod?" Monroe immediately baited Polk by saying he could go back if Polk "didn't want to know what happens from here on out." Polk took the bait, asking, "What happens?" and remained in the interview room. Monroe then began to insinuate that cooperation could affect punishment. Monroe told Polk that "what happens from here can be influenced by what we talk about." Monroe elaborated, "Let me just lay it out for you like this okay, it has been my experience working cases like this, that if somebody cooperates with us, on down the road the county attorney is more likely to work with them." For the next several minutes, Monroe reinforced the message that Polk would benefit by cooperating. For example, Monroe stated county attorneys "are much more likely to work with an individual that is cooperating with police than somebody who sits here and says I didn't do it."

Polk indicated a second time he wanted to end the questioning. Monroe told him he was free to go and "the door is right there if that is what you want to do." Polk walked out of the room and down the hall toward the elevator. Monroe then baited Polk again, stating, "Hey Anthony, I do want to tell you I got paperwork down here charging you with possession of a firearm and going armed with intent." Polk took the

bait a second time, asking, "How did I get charged with a firearm?" He returned to the room for more questioning. After Monroe and Polk agreed to resume the interview, Monroe played on the fact Polk had children:

> I'm telling you, you need to start thinking about what you are going to do for yourself because I know you got a couple of kids out there and I'd hate to see the kids miss their daddy for a long time because you didn't want to talk about what's going on.

Monroe continued: "Man if you don't want to do this for you, do this for your kids. They need their dad around. [35-second pause] Just don't forget you got kids that are depending on you. They need their pops around." The court of appeals observed, "It is clear from this statement that the officer meant to communicate that if Polk confessed, he would spend less time away from his children." We agree. The strategy worked—Polk promptly confessed to taking a firearm to the scene with the intent to shoot Henley and firing shots at Henley there.

Monroe's interrogation strategy goes beyond the permissible tactics approved in *Whitsel*. Monroe did not simply offer to inform the county attorney of Polk's cooperation. Instead, he suggested the county attorney is more likely to work with him if he cooperates and implicitly threatened Polk that silence will keep him from his children for "a long time." Monroe's statements are similar to the officer's statement in *Hodges* that "there was a much better chance of . . . receiving a lesser offense" if the defendant confessed. *See Hodges*, 326 N.W.2d at 349 (emphasis omitted). In each case, the officer suggested the defendant's confessions would likely reduce the punishment.

We conclude Monroe crossed the line by combining statements that county attorneys "are much more likely to work with an individual

that is cooperating" with suggestions Polk would not see his kids "for a long time" unless he confessed. Other courts have cried foul when interrogators imply a confession will reduce the suspect's time away from his or her children:

> The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert . . . "improper influence . . . ."

*United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981); *see also Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S. Ct. 917, 920, 9 L. Ed. 2d 922, 926 (1963) (finding confession involuntary when police told defendant, absent a confession, state financial aid for defendant's child would be cut off); *United States v. Groves*, 470 F.3d 311, 322 (7th Cir. 2006) ("Any level of threats or coercion related to [defendant's] child would weigh against a finding of voluntariness."). *But see United States v. Lee*, 618 F.3d 667, 677 (7th Cir. 2010) (finding officer statement that defendant "had a lot at stake" and that he had three young children to think about did not, by itself, make the confession involuntary). We hold Polk's confession was rendered inadmissible by Monroe's promise of leniency.

### IV. Conclusion.

For these reasons, we conclude the district court erred in denying Polk's motion to suppress his confession. Because we find Polk's confession followed an impermissible promise of leniency, we need not address Polk's *Miranda* claim. We vacate the court of appeals decision, reverse Polk's convictions and sentences, and remand the case for a new trial.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED; CASE REMANDED FOR NEW TRIAL.**

All justices concur except Mansfield, J., who takes no part.