**IN THE COURT OF APPEALS OF IOWA**

No. 14-0004
Filed January 28, 2015

**PAUL JAMES HILL,**
     Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
     Respondent-Appellee.
_____

     Appeal from the Iowa District Court for Woodbury County, Steven J.

Andreasen, Judge.


     Defendant appeals the dismissal of his application for postconviction relief.

**REVERSED AND REMANDED.**


     Hannah M. Vellinga and Rodney D. Vellinga of Corbett, Anderson,

Corbett, Vellinga & Irvin, L.L.P., for appellant.

     Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney

General, Patrick J. Jennings, County Attorney, and Jill Esteves, Assistant County

Attorney, for appellee.


     Considered by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**MCDONALD, J.**

Paul Hill appeals the dismissal of his application for postconviction relief. In his application for postconviction relief, Hill challenged his conviction for child endangerment resulting in death, in violation of Iowa Code section 726.6(1) (2009). The conviction arose out of the death of Hill's child, T.H. Hill contends the postconviction court erred in concluding Hill was not prejudiced within the meaning of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), by trial counsel's failure to move to suppress statements Hill made to the police.

I.

T.H. was born to Hill and Kayla Hegge in October 2008, and deceased on February 17, 2009. The record reflects the child was ill but recuperating prior to death. During the morning of February 12, 2009, T.H. burped or vomited blood and two blood clots while being fed by the parents' childcare provider. T.H. was taken to the doctor and found to have a slightly elevated temperature, fever, chills, and a cough. T.H. was diagnosed with bronchitis and placed on antibiotics. T.H. slept more than usual that day and also had trouble feeding, each feed lasting three times longer than normal and interspersed with gagging. The following day, T.H.'s blood work had normalized, but her fever had slightly increased. Hegge stayed home with T.H. On February 15, T.H. resumed more normal feeding patterns. Hegge felt T.H. was well enough on the morning of February 16 to return to daycare. T.H. went to daycare on the 16th without incident.

On the 17th Hegge left for work early in the morning, and Hill prepared to take T.H. to daycare, which was the parents' usual practice. T.H. appeared fine to Hegge at the time Hegge left for work. The facts and circumstances surrounding T.H.'s death were described in Hill's direct appeal:

> On the morning of February 17, 2009, Hill was alone with his four-month-old daughter, T.H., at the Sioux City home he shared with T.H.'s mother, Kayla. Hill called Kayla twice at work around 8:10 a.m. Kayla did not answer, but called him back at 8:14 a.m. Hill said T.H. was gasping for breath. Kayla told him to call 911. Hill called 911 at 8:21 a.m.:
>> HILL: My four-year-old daughter, she's not— she has a pulse, but she's taking like six seconds or something between breaths and she's not really responding and she's really limp.
>> OPERATOR: Okay. Do you know what happened to her?
>> HILL: I don't know. I was putting her in the car seat to go to work, and she was gasping like noise breathing out.
>
> Kayla and her mother arrived home as Hill was talking to the 911 operator. T.H. was on the floor. Firefighters soon arrived and began treating T.H. Paramedics arrived and transported her to Mercy Medical Center, where she was admitted at 8:40 a.m. She was then life-flighted to the Children's Hospital in Omaha, Nebraska. T.H. was pronounced dead at 3:18 p.m. Her death was the result of lacerations to the mesenteric artery. She also had rib fractures and subdural hemorrhaging.
>
> At approximately 6:00 p.m. that evening, Hill spoke with Sioux City police detectives Ryan Bertrand and Bruce Hokel, as well as Iowa Department of Human Services worker Chantel Rol, in the hospital break room. Detective Bertrand immediately read Hill his *Miranda* rights and asked if he understood those rights. Hill said he understood and agreed to speak to the group.
>
> After some preliminary questions, Hill described his morning with T.H. After he got himself ready for work, Hill picked T.H. up from her bassinet and changed her diaper. Her stool was liquidy, but she was not fussy. While changing her diaper, Hill noticed "a big bruise" on T.H.'s stomach. Hill stated, "[S]he's making this like crying face, but she's not crying. And it seemed like she was breathing okay." Hill continued to explain:
>> [S]he was—her head was going back and forth like this and—well, I picked her up. She kind of took a

deep breath. And when I laid her, I held her like this [on his shoulder with her head up] and . . . grabbed the car seat, put it on the table. And when I laid her down, she did a gasp like [imitating], like that. And, wow, that's kind of—she's never done that before. I was like—kind of messed around with her a little bit. She kind of was looking around, bobbing her head back and forth. And when I took her out, she was limp. Then she started kind of losing color in her lips. And that's when I laid her on the couch. And from there I don't know why I tried calling Kayla again. It wouldn't pick up. And then she called.

Detectives Bertrand and Hokel told Hill his version of the events did not coincide with what the doctors were saying had happened to T.H. At that time, doctors believed T.H.'s spleen had been injured. The detectives pressed Hill to tell the truth and often asked questions together. The manner of the questioning was hostile, intimidating, and demanding. Hill maintained he did not do anything, but also stated that no one else could have been responsible for T.H.'s injuries. He repeatedly denied hurting the child.

After approximately four and a half hours, Hill admitted his involvement in T.H.'s injuries and death. He stated that he had gotten frustrated with T.H.'s snowsuit that "was too bulky" and the carseat that "wouldn't buckle," and admitted he might have hit or pushed too hard on T.H. while he was trying to buckle her in the car seat. He explained that as he was trying to buckle the car seat, he "grabbed it, and it was—I don't think I did it too hard, but I just did it real quick." He later admitted that "frustration" hit him for a "split second" and he "definitely did it too hard . . . [t]here's no maybes about it." He also said he "freaked out" afterwards and may have shaken T.H. to try to revive her. Hill insisted he was not mad at T.H. and had not purposely tried to hurt her. He asked detectives what was going to happen to him and how long he was going to go to prison. He apologized for not admitting what had happened earlier and explained that he "never really thought till you mentioned the car seat. It hit me. I was just scared. Did you go tell my parents?"

The next day, Dr. Thomas Carroll, the county medical examiner, performed an autopsy on T.H. Dr. Carroll observed three bruises on T.H.'s abdomen. When he opened T.H.'s abdomen, he discovered a large volume of blood and two lacerations to T.H.'s mysentery [sic]. Dr. Carroll opined the injuries were the result of blunt force trauma by "some instrument or fist" to T.H. An x-ray indicated several rib fractures, which Dr. Carroll determined occurred several days prior to T.H.'s death. Finally, Dr.

Carroll observed a severe, closed-head injury to T.H.'s brain, which he opined occurred at the same time as the mesentery injuries. Dr. Carroll opined T.H.'s death was caused by the laceration to her abdomen, an inflicted injury. However, he further stated T.H. could have died from the closed-head injury alone. Dr. Carroll stated the manner of T.H.'s death was homicide, and "she died from inflicted injury."

*State v. Hill*, No. 10-1328, 2011 WL 3688989, at *1-2 (Iowa Ct. App. Aug. 24, 2011).

Hill was arrested and charged with child endangerment resulting in death, in violation of Iowa Code section 726.6(1) and (4), and multiple acts of child endangerment, in violation of Iowa Code section 726.6A. Hill waived his right to jury trial, and the case was tried over eight days to the district court. At trial, Hill's counsel did not move to suppress any part of Hill's statements made at the hospital to the investigating detectives. The statements were admitted into evidence. The district court found Hill guilty of child endangerment resulting in death and acquitted him of multiple acts of child endangerment. On direct appeal, Hill contended his counsel provided constitutionally deficient representation by failing to move to suppress Hill's statements to the detectives. This court preserved Hill's claim for postconviction relief proceedings. *Hill*, 2011 WL 3688989, at *4.

In his application for postconviction relief, Hill claimed the incriminating statements he made to the detectives were obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Iowa Constitution. He further claimed his trial counsel was constitutionally ineffective for failing to move to suppress

these statements. The postconviction court found Hill's trial counsel should have moved to suppress part of Hill's statements. Specifically, the postconviction court found that Hill asked to terminate the interview and leave on at least eleven occasions. In response to one of the earlier requests to leave, one of the detectives told Hill, "I'll decide when it's time for us to go" and then continued with questioning. The postconviction court concluded the interview, after this point, constituted a custodial interrogation within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that Hill's incriminating statements were obtained in violation of Hill's right to remain silent.

While the postconviction court concluded some of Hill's statements would have been suppressed had Hill's trial counsel filed a motion to suppress, the postconviction court ultimately concluded Hill was not prejudiced by this failure and held:

> The Court is not convinced a reasonable probability exists that, without Hill's incriminating statements, the outcome of his trial would have been different. While the trial court may have mentioned Hill's admissions in its decision, the trial court also reached the conclusion that the medical testimony presented by the State at trial was more credible than the opposing medical testimony presented by Hill. The Court does not think [the trial court judge] rested his verdict on Hill's statements; rather, the Court concludes [the trial court judge] simply referenced the incriminating statements as another brick in the wall of circumstantial evidence. The Court's confidence in the outcome of the case is not undermined without Hill's admissions.

The postconviction court then granted the State's motion for summary judgment, denied Hill's cross-motion for summary judgment, and dismissed Hill's application for postconviction relief. Hill timely filed this appeal.

II.

"Though rulings on postconviction relief are usually reviewed for a correction of errors at law, when an applicant asserts a constitutional claim as the basis for postconviction relief, we review that claim de novo." *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). To establish a claim for ineffective assistance of counsel, Hill has the burden of establishing "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). Failure to prove either element is fatal to the claim. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). To prove counsel failed to perform an essential duty, Hill must establish his counsel's representation dropped below an objective standard of reasonableness. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014). Regarding prejudice, the ultimate inquiry is whether trial counsel's allegedly deficient performance caused a complete "breakdown in the adversary process" such that the conviction is unreliable. *See Strickland*, 466 U.S. at 687. This requires the defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012).

A.

We first address the issue of whether trial counsel breached an essential duty. Hill argues the postconviction court properly determined counsel breached an essential duty by failing to move to suppress statements obtained in violation of Hill's right to remain silent. The State does not present any argument on the

issue, explaining it "accepts for the sake [of] argument the postconviction court's conclusion that Hill was in custody and unambiguously invoked his right to remain silent." The State then cites authority for the proposition that the successful party on summary judgment need not cross-appeal to preserve error with respect to an issue urged but ignored or rejected in the district court. We agree with that general proposition, as far as it goes. However, the fact that the issue is preserved for appellate review does not obviate the need to actually present argument on the issue. To address this issue under these circumstances, we would be obliged "to assume a partisan role and undertake the appell[ee]'s research and advocacy." *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) (dismissing an appeal based on the failure to cite any authority). We decline to do so. We conclude the State has waived argument on this point. *See* Iowa R. App. P. 6.903(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *Baker v. City of Iowa City*, 750 N.W.2d 93, 102-03 (Iowa 2008); *State v. Miranda*, 672 N.W.2d 753, 761 (Iowa 2003) (holding State waived issue relating to custodial interrogation by failing to address issue); *Inghram*, 215 N.W.2d at 240. We thus conclude the district court did not err in finding counsel breached an essential duty owed Hill by failing to move to suppress Hill's statements.

B.

We next address the issue of whether the district court erred in finding Hill did not establish prejudice. The State's theory of the case was that on the morning of February 17 Hill became frustrated while buckling T.H. into her car

seat and intentionally struck T.H. in the abdomen or applied excessive force to her abdomen causing acute abdominal injury resulting in death. Aside from Hill's incriminating statements, the most important evidence in support of the State's case was medical evidence suggesting T.H. would have been immediately symptomatic following injury. Thus, the State argues, the medical evidence "conclusively established that the trauma to the abdomen occurred during the morning of February 17 when Hill was the only person who had care and control of the child." The theory of Hill's case was that the injury causing T.H.'s death could not have occurred on the day she died, but rather must have occurred earlier when T.H. was not in Hill's exclusive control and care. We conclude that without Hill's incriminating statements a reasonable probability exists that the result of his trial would have been different.

First, contrary to the State's assertion, the medical evidence regarding the timing and cause of the injury (and thus who potentially could have caused it) was disputed at trial. By way of example, the defendant's witness, Dr. Ophoven, testified that the injury resulting in T.H.'s death could not have occurred on the morning of T.H.'s death:

> Q: Doctor, how did [T.H.] die? A: She died with complications from blunt force trauma to the abdomen.
> . . . .
> Q: Okay. Do you have an opinion within a reasonable degree of medical certainty as to the approximate sequence and timing of events that led to the rupture of the artery?
> . . . .
> A: It's my opinion that there is evidence to absolute medical certainty that there was trauma to the mesenteric tissues of her abdomen that preceded her fatal collapse by days. In my opinion, that makes the determination of the exact cause of the final rupture

of the vessels an unanswerable question at this point, but it is entirely consistent with complications from the initial trauma.

Q: And do you have an opinion . . . that the rupture of the mesenteric artery then was . . . a number of days after the blunt force trauma to the abdomen?  A:  It's entirely consistent with that sequence of events, yes, sir.

She also testified:

A: Is [the blunt force trauma] fresh?  No.  Is there evidence of healing?  Absolutely.  Does that take this case out of a fresh blunt force trauma occurring on the day the child comes to the hospital as the primary cause of her death?  Absolutely.

The State argues this testimony does not actually conflict with the finding that Hill may have struck T.H. on the morning of the 17th.  That is true.  This testimony, however, does directly conflict with the finding that Hill stuck a blow resulting in death on the morning of the 17th while T.H. was in Hill's exclusive care and control.

Second, a defendant's incriminating statements are incredibly powerful in a criminal trial.  *See State v. Polk*, 812 N.W.2d 670, 674 (Iowa 2012) ("'It is obvious that confession evidence is of great importance in a criminal trial.'" (citation omitted)).  "'A confession is like no other evidence.  Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'"  *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).  Not only do the defendant's statements have evidentiary value commensurate with the content of the statement, to the extent the incriminating statement is tantamount to a confession of guilt, the statement casts a long shadow on the remainder of the evidence—laying foundation for operation of cognitive bias in

which the credibility of the defendant's evidence is diminished, while the credibility of the State's evidence is enhanced. *See* Keith A. Findley & Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 Wis. L. Rev. 291, 308-317 (2006) (discussing cognitive bias created by perception of guilt). This is not to say the trial court here was biased against the defendant, as that term is normally understood. Instead, it is merely an acknowledgement that the tendency to give greater weight to information that supports existing beliefs than to information that runs counter to them is innate. *See id.*

Third, unlike most claims of ineffective assistance of counsel, we have fairly direct evidence regarding the impact Hill's incriminating statements had in this case. Here, the district court, in finding Hill guilty of child endangerment resulting in death, explicitly stated it relied on Hill's admissions:

> [T.H.'s] history, the nature of her injuries and Defendant's admissions convince the Court that Defendant struck [T.H.] in the abdomen the morning of February 17, 2009 . . . . The medical evidence produced by the state, Defendant's statements to the police, and Defendant's conduct, such as the delay in calling 911, convince the Court of Defendant's guilt beyond a reasonable doubt.

In contrast, the district court acquitted Hill of multiple acts of child endangerment. The trial court explained that acquittal was appropriate, in part, because the defendant made no incriminating statements related to the injuries underlying the charge of multiple acts of child endangerment. In discussing an injury related to T.H.'s ribs, for example, the court found:

> Defendant has made no admission concerning these injuries. Medical evidence does not identify causation. Even though circumstantial evidence points to Defendant (rough handling and frustration), the Court cannot find beyond a reasonable doubt that Defendant's conduct resulted in [T.H.'s] fractured ribs.

It thus seems apparent that Hill's incriminating statements in fact made a difference to the trial court.

Although the burden of proof and legal framework is somewhat different, some guidance can be taken from decisions applying a harmless error analysis. In *State v. Harris*, 741 N.W.2d 1, 10 (Iowa 2007), our supreme court held the admission of the defendant's wrongfully-obtained confession into evidence at a bench trial was not harmless error where the district court's findings of fact acknowledged reliance on the confession. Other courts have reached a similar conclusion. *See, e.g.*, *State v. Crews*, 406 S.W.3d 91, 94-95 (Mo. Ct. App. 2013) (holding that admission of hearsay evidence was not harmless error where "'it is clear from the record that the trial judge considered and relied upon the inadmissible evidence'" (citation omitted)); *State v. Potts*, 255 P.3d 614, 615 (Or. Ct. App. 2011) (per curiam) (holding admission of evidence was not harmless error where there was an "affirmative indication by the court that it actually relied on the evidence in question"); *Buck v. State*, 956 A.2d 884, 909 n.11 (Md. Ct. Spec. App. 2008) (holding error of trial court in not suppressing defendant's pre-*Miranda* confession was not harmless in bench trial of defendant for first-degree murder where the trial judge relied at least in some part on defendant's statements); *cf. State v. Crites*, 400 S.W.3d 828, 835 (Mo. Ct. App. 2013) (holding admission of defendant's confession was harmless error in bench trial where "there is no indication the trial court relied on [the defendant's] statements in reaching a verdict"); *Hammond v. State*, 479 N.E.2d 629, 631 (Ind. Ct. App. 1985) (holding admission of inculpatory statement was harmless error in bench

trial where trial court specifically stated that defendant's statement did not enter into its determination of guilt).

Given the foregoing, we conclude the district court erred in concluding Hill failed to establish prejudice. We hold that but for the admission into evidence of defendant's incriminating statements, there is a reasonable probability the result of the proceeding would have been different. *See Kimmelman v. Morrison*, 477 U.S. 365, 388-90 (1986) (finding that removal of important evidence from a trial, albeit not the most important evidence, may have tipped the balance in favor of the defendant); *Strickland*, 466 U.S. at 694; *State v. Fisher*, No. 99-1098, 2000 WL 1724552, at *5 (Iowa Ct. App. Nov. 20, 2000) (finding defendant was prejudiced by counsel's failure to file a motion to suppress evidence and admissions and holding, "without . . . [defendant's] later statement to the police, the prosecution's case would have been substantially weakened and the outcome would likely have been affected"); *see also People v. Coleman*, 704 N.E.2d 690, 698 (Ill. Ct. App. 1998) (holding *Strickland* prejudice standard satisfied in bench trial where trial court stated it relied on evidence at issue).

## III.

For the foregoing reasons, we conclude the district court erred in granting the State's motion for summary judgment, in denying the defendant's motion for summary judgment, and in dismissing the defendant's application for postconviction relief. Given the State's concession here that the challenged statements were obtained in violation of defendant's right to remain silent, we

conclude the defendant established prejudice as a matter of law.  We remand this matter for further proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**