# IN THE COURT OF APPEALS OF IOWA

No. 19-0047
Filed November 4, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CURTIS CORTEZ JONES,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Johnson County, Chad A. Kepros,

Judge.

        A defendant appeals his conviction for first-degree murder, claiming the

district court should have suppressed incriminating statements he made during a

police interview. **AFFIRMED.**

        Jeffrey L. Powell of Powell & McCullough, PLC, Coralville, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.

        Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

A jury convicted Curtis Jones of first-degree murder in the shooting death of cabdriver Ricky Lillie. Jones now seeks to reverse that conviction and win a new trial. He contends the district court should not have allowed the jury to hear statements he made to investigators during a custodial interrogation. While Jones did not confess to the crime, he claims the court should have suppressed his incriminating statements as involuntary. Jones contends the officers employed intimidation tactics, that coupled with his use of marijuana and Xanax before the interview, amounted to coercion.

Considering the totality of the circumstances, as Jones urges, we do not perceive his statements to be the product of police overreach. Likewise, the recorded interview reveals no impairment linked to Jones's self-reported "high" from ingesting drugs. Rather, Jones tracks the officers' questions and answers coherently throughout the interrogation. Because Jones made the statements voluntarily, the district court properly denied his motion to suppress. Thus, we affirm his conviction.

## I. Facts and Prior Proceedings

Lillie was working an overnight shift as a taxicab driver in June 2017. Around 3:00 a.m., a dispatcher for Yellow Cab noticed Lillie's taxi had not moved from the Alexis Park Inn parking lot in Iowa City for several hours.[1] Believing Lillie could have fallen asleep, the dispatcher sent driver Patrick Madden to check on

---

[1] The dispatcher could monitor drivers' movements at the main office through a centralized computer system. Each taxicab had a computer tablet with GPS capability that notified the dispatchers of the drivers' current locations. The tablet remembered route information and tracked when a ride began and ended.

him. When Madden arrived at the parking lot, he saw Lillie slumped down on the taxi's front passenger seat. After several unsuccessful attempts to wake Lillie, Madden told the dispatcher to call 911. The responding officer "knew immediately" that Lillie was dead. The officer noticed blood smeared inside the taxi and "pooling" on the ground outside the passenger-side door.

An autopsy determined Lillie died from two gunshot wounds to the head at close or contact range. But crime scene investigators found no weapons or shell casings inside the taxi. They also found no cash despite the fare log showing Lillie took in nearly eighty dollars that night. The medical examiner recovered only a five dollar bill and loose change in Lillie's pockets. Later, officers found Lillie's wallet "tucked in" a bush within walking distance of the Alexis Park Inn.

To start their investigation, Iowa City police used Yellow Cab's GPS tracking system to pinpoint the last trip Lillie took before he was killed. Following that route, officers discovered a passenger flagged Lillie's cab at the Kum & Go station near downtown Iowa City around 10:50 p.m. The taxi arrived at the Alexis Park Inn fifteen minutes later. Based on video surveillance footage from the gas station and the hotel, officers later identified the passenger as Jones. The footage showed Jones exiting the cab at the Alexis Park Inn. And no one else approached the vehicle before Madden found Lillie's body a few hours later.

Meanwhile, the Keota Police Department was also looking into Jones for a different crime involving a stolen Pontiac G6.[2] The day after the murder, police

---

[2] The Keota chief of police received a report that a Pontiac had been stolen the same day as the Lillie murder. After speaking with several eyewitnesses, the officer suspected Jones was involved.

officers from Keokuk County located the Pontiac at a Burlington motel where Jones had checked in earlier that day. After seeing video proof that Jones drove the Pontiac, the Keota police obtained a warrant to arrest Jones for theft. Around the same time, Iowa City police issued a press release with an image of the suspect in Lillie's homicide, asking the public for help with identification. Recognizing Jones by his clothing and a distinctive green athletic backpack, the Keota officer contacted the Iowa City police and shared information about the outstanding arrest warrant in the car theft.

With Jones identified as the suspect in Lillie's murder, Iowa City detective Benjamin Hektoen and several colleagues surveilled the apartment where Jones's mother lived in Mount Pleasant. When the mother drove from the apartment parking lot with Jones in the passenger seat, law enforcement conducted a traffic stop.[3] Officers ordered Jones from the car, onto the ground, and handcuffed him. Then, Hektoen approached Jones and assisted him to his feet. At that point, another officer's body camera captured Hektoen giving Jones the *Miranda* warnings.[4] After reciting the rights, Hektoen asked Jones, "Do you understand everything I just said to you?" Jones "nodded in agreement and said yeah."[5]

---

[3] Officers from the Mount Pleasant Police Department, Henry County Sheriff's Office, and the Iowa State Patrol stopped the vehicle and removed all the passengers. This encounter took place on a public street in the afternoon.

[4] Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a person accused of a crime must be warned before police questioning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

[5] Several officers testified that they drew their weapons during the "felony stop" anticipating Jones could be dangerous. But they holstered their guns after Jones was in handcuffs. According to Hektoen, no weapons were displayed when he read Jones his *Miranda* rights.

Following the arrest, Hektoen and officer Niles Mercer took Jones to the Henry County Sheriff's Office for questioning.[6] Jones waited over an hour for the interview because Hektoen and Mercer needed time to meet with local law enforcement to discuss the investigation's next steps. During that time, deputies provided Jones a full meal, drink, and access to the restroom. Jones remained in handcuffs, a belly chain, and leg restraints while he was in custody.

The interview took place in a processing room at the sheriff's office.[7] The officers began the interview without reminding Jones of his *Miranda* rights. They first asked Jones about the stolen car in Keota. Recalling those inquiries, Hektoen testified: "[Jones] responded to my questions clearly, he articulated his answers, he spoke directly and accurately for the most part, and seemed to understand everything that I was asking him."

But when the officers shifted to asking about the homicide, they noticed a change in Jones's tone. Hektoen explained: "His responses to me during that line of questioning were very inconsistent, he was unable to provide a coherent line of answers to my questions, and he asserted the fact that he was high." When the officers asked what he was high on, Jones claimed he used "marijuana wax" and took Xanax earlier that day. After that exchange, Jones often mentioned using drugs rather than answer questions. The officers believed the references to drug use were "excuses for his inability or unwillingness to provide an accurate statement of his activities." Both officers had specialized training and experience

---

[6] Only three to four minutes elapsed from Jones receiving his *Miranda* warnings until they arrived at the sheriff's office.

[7] The room was about ten-feet wide by eighteen-feet long and held three chairs, some shelves, and a couple of computers.

in identifying when a person was under the influence, and neither believed Jones showed signs of drugs or alcohol impairment.

The interview grew confrontational when the officers pressed Jones about inconsistencies between his version and the video surveillance on the night of the homicide. At that point, Jones looked confused and asked, "Why am I being questioned?" Without responding, the officers circled back to the stolen Pontiac.[8] But then a frustrated Hektoen accused Jones of lying and said he had video proof that Jones left the cab at the Alexis Park Inn before the driver was found dead. From there, the once-cordial interview took a hostile turn. Both the officers and Jones raised their voices and yelled profanities. Detective Hektoen, who sat about three to four feet away from Jones, leaned closer at times—though he never made any physical contact with Jones. Despite the hostility, Jones did not assert his right to remain silent or invoke his right to have an attorney present.[9]

After the State charged him with murder, Jones moved to suppress all the statements he made during that interview. Jones challenged both the voluntariness of his *Miranda* rights waiver and the voluntariness of his

---

[8] The interviewers questioned Jones about both investigations because they believed the two crimes were related. They believed the stolen car proved Jones's motive and preparation for the murder.

[9] In the interview's last two minutes, officers asked Jones about a different, then unsolved, Iowa City homicide. *See State v. Jones*, No. 19-0494, 2020 WL 3264377, at *1 (Iowa Ct. App. June 17, 2020) (upholding same suspect's murder conviction in the April 2017 death of Jonathan Wieseler). Jones said: "Next time you come, bring my lawyer with you." Believing that retort did not invoke his right to counsel, the officers continued to ask a few more questions. Even so, the officers ended the interview shortly after without eliciting any more incriminating statements.

statements.[10]    At the March 2018 suppression hearing, the State presented testimony from Hektoen and Mercer and offered a bodycam video showing the *Miranda*-warning recitation, as well as audio and video recordings of the interview.

In its June ruling, the court denied the motion on both grounds.    In determining Jones voluntarily waived his *Miranda* rights,[11] the court considered the totality of circumstances, including the time, place, and manner in which Jones received the *Miranda* warnings; the lack of physical coercion; Jones's age and intelligence; and Jones's "great deal of familiarity with the criminal justice system, and with his *Miranda* rights specifically."  The court also found no proof that Jones's alleged intoxication undermined the voluntary nature of his waiver.

On the separate issue of the voluntariness of Jones's statements after the *Miranda* waiver, the court determined "the record [did] not support [Jones's] claim that his will was overborne or that his capacity for self-determination was critically impaired."  The court considered the "reasonable duration" of the interview, the lack of physical coercion (such as displaying weapons or using physical force), and Jones's ability to respond appropriately to the officers' questions.  Again, the court noted the video did not show Jones's alleged intoxication affected the voluntariness of his statements.  Finally, the court determined Jones did not unambiguously invoke his right to an attorney by saying, "Next time you come,

---

[10] The motion also challenged the adequacy of the *Miranda* warnings, but the defense withdrew that claim at the suppression hearing.

[11] An accused waives the *Miranda* rights only when "the waiver is made voluntarily, knowingly and intelligently."  *Miranda*, 384 U.S. at 479.  The State has the burden to prove the accused waived those rights before making a statement.  *Id.*  If the State fails to meet that burden, "no evidence obtained as a result of interrogation can be used against [the defendant]."  *Id.*

bring my lawyer with you." Rejecting Jones's arguments for suppression, the court allowed the State to use his statements as evidence at the trial.

But those statements represented a small slice of the State's proof.[12] During the fifteen-day jury trial, the State presented more than forty witnesses and offered over a hundred exhibits, including a redacted version of the police interview recording.[13] After hearing all the evidence, the jury convicted Jones of first-degree murder, in violation of Iowa Code sections 707.1 and 707.2(1)(A)–(B) (2017). The court sentenced him to life imprisonment without parole. Jones appeals.

## II. Scope of Review

We review challenges to suppression rulings based on federal and state constitutional grounds de novo.[14] *See State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007). This requires us to "make an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001) (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Turner*, 630 N.W.2d at 606 (citation omitted).

---

[12] Although Jones denied shooting Lillie, he did make incriminating statements during the interview. Prime among those were Jones's admissions to being at the Kum & Go and taking a cab on the night of the murder.

[13] The redactions related to Jones's criminal history, prior incarceration, and any comments made by the officers about Jones's credibility.

[14] In his motion to suppress, Jones cited both the Fifth Amendment to the U.S. Constitution and Article I, Section 9 the Iowa Constitution. But he cites neither provision in his appellant's brief. Because Jones relies on case law that cites the federal provision and does not advocate for a separate analysis under the state constitution, we apply the general federal framework.

### III. Voluntariness of Jones's Statements to Police

We start by clarifying the issue before us. As the district court explained, whether Jones made his statements after an effective waiver of his *Miranda* rights and whether his statements were voluntary are separate issues. *See State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982) (citing *State v. Snethen*, 245 N.W.2d 308, 311 (Iowa 1976)).

Yet Jones blurs the line between those claims on appeal. In his appellant's brief, Jones states: "The question is whether Jones' waiver was voluntary, and if Jones' Miranda rights were intelligently abandoned." But he does not then analyze that *Miranda*-waiver issue. Instead, Jones argues his statements were involuntary. He claims drug use impaired his ability to respond to the officers' questions and made him "more susceptible to manipulation."

Responding to Jones's argument, the State contends in its appellee's brief: "His only challenge is that his statements were involuntarily made, due to intoxication from drugs and coercive police questioning." Jones filed no reply brief to correct the State's contention. Like the State, we read Jones argument as limited to the voluntariness of his statements.

To determine voluntariness, we look to the totality of circumstances— encompassing both the characteristics of the accused and the details of the interrogation process.[15] *State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975).

---

[15] When defendants contend their confessions stem from impermissible promises of leniency by their interrogators, our supreme court applies an evidentiary test for admissibility rather than the constitutional totality-of-circumstances test. *See State v. Polk*, 812 N.W.2d 670, 674 (Iowa 2012) (citing State *v. McCoy*, 692 N.W.2d 6, 27–29 (Iowa 2005)). In his brief, Jones makes the fleeting assertion: "Officer Hektoen implied that Jones may be able to receive a charge of involuntary

Those circumstances must show "the statements were the product of an essentially free and unconstrained choice, made by the subject at a time when that person's will was not overborne or the capacity for self-determination critically impaired." *State v. Bowers*, 656 N.W.2d 349, 353 (Iowa 2002) (citations omitted). The State must prove voluntariness by a preponderance of the evidence. *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997). In making this assessment, we consider (1) the defendant's age, experience, and prior record, (2) the length of the detention and interrogation, (3) whether the interviewers used physical coercion, including the deprivation of food or sleep, (4) whether the defendant understood the questions, and (5) "the defendant's physical and emotional condition and his reaction to the interrogation." *Hodges*, 326 N.W.2d at 348. A defendant's intoxication is one factor in the analysis. *See State v. Smith*, 546 N.W.2d 916, 926 (Iowa 1996).

Applying those factors here, we find little support for Jones's coercion claim. Jones was forty-one years old and had an extensive criminal record, which suggests he understood the nature of the interrogation and his *Miranda* rights. The officers interviewed Jones for an hour and fifteen minutes—not a particularly taxing length of time. Granted, Jones waited an hour before the interview. But during that wait, officers provided him refreshments and restroom breaks. *See Heaivilin v. State*, No. 04-0322, 2005 WL 599694, at *2 (Iowa Ct. App. Mar. 16, 2005) (finding no coercion despite fact that the accused was held at police station for

---

manslaughter instead of First Degree Murder, if Jones changed or altered his statement that he didn't remember being in Iowa City." But Jones does not advocate for the common-law test for admissibility in his briefing. So we decline to make that argument on his behalf.

about seven hours and interviewed for two hours). The officers explained that Jones understood their questions about the car theft. But they perceived that he feigned confusion when the conversation turned to Lillie's murder. Our review of the video corroborates their perception. Jones appeared coherent throughout the interview and directly addressed the officers' questions. He discussed his family and his work history. And he offered a detailed timeline of his activities during the week before.

On appeal, Jones focuses on the last in the list of voluntariness factors: his physical and emotional condition and his reaction to the interrogation. To bolster his argument, he relies on two of our unpublished cases, *State v. Cue*, No. 08-1596, 2009 WL 3337668, at *9 (Iowa Ct. App. Oct. 7, 2009) and *State v. Ellenbecker*, No. 15-0726, 2016 WL 3272168, at *4 (Iowa Ct. App. June 15, 2016). In those cases, we decided that pointed police interrogation could amount to unconstitutional coercion when the suspect was vulnerable from being intoxicated, taking pain killers, or experiencing emotional distress. We find Jones's reliance on those two cases is misplaced. Unlike *Cue* and *Ellenbecker*, where there was objective proof of the defendants' intoxication and heightened emotions, we have no similar proof of Jones's impairment besides his own assertion. We are also unable to detect from the video recording of the interview that Jones was in a debilitated mental state. Although Jones expressed confusion and heightened emotions in flashes, he reacted with hostility only when the officers asked him targeted questions about the murder.

The State analogizes Jones's interview to the questioning in *State v. Countryman*. In that case, our supreme court found the defendant's statements

were voluntary because she was easy to understand and responsive to the officers when asked "about her name and where she was from." *Countryman*, 572 N.W.2d at 559. The court noted Countryman "seemed conscious of the meaning of her words and able to appreciate the nature and consequences of her statements" despite exhibiting confusion and being under the influence of drugs. *Id.* The court decided the evidence did not show Countryman's "mental state was so disabling as to render her unable to make a voluntary statement, or that she was unduly susceptible" to police manipulation. *Id.*

Applying that standard to Jones, we find his professed ingestion of drugs before the interview did not affect him to a degree sufficient to render his statements involuntary. Jones did not slur words or act drowsy. His conversation was consistently logical, even if evasive and combative. Early in the interview, before the officers raised their voices, Jones acknowledged taking a cab ride from the Kum & Go. But he insisted he asked to be dropped off at a nearby HyVee grocery store and someone else got into the cab. Jones stuck to that story despite pressure from the officers to admit to the murder. And although Jones claims he was in an "agitated emotional condition" out of concern for his mother who witnessed his arrest, that concern did not manifest as so intense that it impinged on his judgment. Jones mentioned his mother when Hektoen and Mercer were no longer in the room, thus undermining any claim of influence.

As to Jones's claim of police intimidation, the record does not show the officers' tactics defeated his capacity for self-determination. True, the officers did accuse Jones of lying as their interrogation reached a crescendo. But for the most part, they talked to Jones in a calm manner. Jones also highlights his placement

in the corner of the interview room with leg chains and handcuffs.[16] But those restraints did not critically impair his ability to make voluntary statements given the totality of circumstances. The State established by a preponderance of the evidence that Jones's statements were the product of his "essentially free and unconstrained choice" to provide information in response to the officer's questioning. Because Jones's will was not overborne during the interview, we find the statements were voluntary and admissible.

But even if the district court should have suppressed the statements, their admission was harmless beyond a reasonable doubt because the State offered overwhelming evidence of Jones's guilt. *See State v. Wells*, 738 N.W.2d 214, 219 (Iowa 2007). The record contains strong proof enabling the jury to convict Jones for Lillie's murder, separate from Jones's statements. Video surveillance footage placed Jones both at the Kum & Go and at Alexis Park Inn on the night of the murder. The Keota officer and other witnesses identified Jones as the person in the video. The State offered physical evidence connecting Jones to the crime. For instance, at his mother's apartment building, witnesses found a handgun bearing Jones's DNA and containing ammunition that matched the bullets used to kill Lillie. The shoes Jones wore when officers arrested him had stains containing DNA from both Lillie and Jones. The State also offered evidence that Jones called an acquaintance from jail, asking him to retrieve another hidden handgun, which was stolen at the same time as the murder weapon. Given all this evidence, any error

---

[16] The handcuffs did not prevent Jones from accessing a water cup provided to him during the interview and the leg chains did not prevent him from walking to the restroom when he told the officers he needed a break.

in admitting Jones's statements was harmless.  Thus, we affirm Jones's first-degree murder conviction.

**AFFIRMED.**