# IN THE SUPREME COURT OF IOWA

No. 21–0756

Submitted November 16, 2022—Filed January 27, 2023

**STATE OF IOWA,**

 Appellant,

vs.

**GOWUN PARK,**

 Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dallas County, Brad McCall, Judge.

The State seeks further review of a court of appeals decision affirming the suppression of certain police interrogations of the defendant. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court in which all participating justices joined. Waterman and May, JJ., took no part in the consideration or decision of the case.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellant.

Tammy Gentry (argued) and Gina Messamer of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, L.L.P., Des Moines, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Our legal system tolerates some deception by law enforcement. But when a suspect is being questioned, law enforcement may not use deception that overcomes the suspect's free will and may not make deceptive promises that would be likely to trigger a false confession. In this case, a man died of strangulation after being zip-tied up in a chair in his apartment. His wife was the only other person present. The wife claimed, improbably, that he had tied himself up. After interviewing her at the apartment, police officers took her to the police station, Mirandized her, and questioned her further about how the man came to be tied up. Initially, the officers told the woman falsely that doctors were still working to try to save the man's life—a deception they corrected only about an hour and a half into the interview. The detectives also made various reassurances and suggestions: that nobody deserves to be abused; that "people would understand" if she was a victim of domestic abuse; that if an accident had occurred, they needed to know; and that they were there to "help" her. The wife continued to claim that her husband had tied himself up. The wife was released but was arrested several days later and charged with murdering her husband.

On our review, we find that the officers' deception did not exceed what our legal system tolerates. The lie about whether the man had been pronounced dead didn't affect the woman's essentially knowing and voluntary waiver of her *Miranda* rights. The officers' blandishments and expressions of sympathy didn't amount to concrete promises of leniency—either express or implied—that would create a fair

risk of a false confession. Accordingly, we vacate the court of appeals decision and reverse the district court suppressing this interview and subsequent interviews. We also affirm the court of appeals decision that reversed the district court and found the immediate on-the-scene questioning following the woman's 911 call to be noncustodial and admissible.

**II. Facts and Procedural History.**

**A. The Defendant's 911 Call and the Arrival of Paramedics and Police.**
Defendant Gowun Park has a bachelor's degree, a master's degree, and a Ph.D. from universities in the United States. She was teaching economics at Simpson College at the time of her husband Sung Woo Nam's death. Park has lived in the United States for the last twenty years. Although Korean is her native language, she is fluent in English.

At 6:46 p.m. on Saturday, February 15, 2020, Park called 911 to report that her husband Nam was not breathing. When paramedics and West Des Moines police arrived at Park and Nam's apartment, they found Nam face down in the study room of the apartment, unconscious with no vital signs. Nam had ligature marks on the front of his neck and throat as well as zip tie marks on his wrists and ankles.

While the paramedics attended to Nam, two women police officers—Molly Sweeden and Jordan Hinrichsen—took Park aside, made efforts to calm her down, and asked her what had happened. Park was swooning and crying hysterically. Park said she had been with her husband in the study an hour before and had then moved to the living room, where she fell asleep while

watching television. Park said that upon waking, she found Nam had tied himself to a chair that was leaning forward onto the floor. She cut him loose. Park indicated that her husband had been suicidal in the past, had attempted suicide about two years before, and had talked about suicide that day.

The paramedics made efforts to revive Nam before transporting him to the hospital. Park was allowed to see Nam briefly as he was being wheeled out of the apartment. Officer Hinrichsen told Park that Nam was still not breathing. Park asked repeatedly if she could go to the hospital to be with her husband. Officers told her she would be able to go once they got the information they needed to understand what happened. They told her she could then arrange a ride to the hospital since she was not in an emotional condition to drive. Officer Sweeden continued her efforts to calm Park.

Nam was later pronounced dead at the hospital.

**B. February 15 Interview of the Defendant at the Apartment.** Meanwhile at the apartment, after about twenty minutes, Sergeant Matthew McCarty joined the discussion which was now occurring in the living room. Sergeant McCarty asked Park if she remembered where the ties had been and specifically whether he had been tied around his neck. Park said she couldn't remember.

Park sought repeatedly to retrieve her cell phone from the study to call an unnamed friend. After discussing the matter among themselves, the officers explained that they could not give her access to her phone or anything else in

the study. Park declined Sergeant McCarty's offer to place the call for her and other proposed alternatives that would allow her to contact the friend.

Once paramedics had transported Nam to the hospital, Park was generally allowed to move freely around the apartment except for the study, where officers remained gathering evidence. Officer Sweeden briefly escorted Park into her bedroom and made her stay there so that Officer Hinrichsen could take photographs in the living room.

About forty minutes after the paramedics and the police had first appeared, a detective—Chris Morgan—arrived. He started reading notes to update himself on the situation. Park asked Detective Morgan if she could get her cell phone so she could go to the hospital. Detective Morgan responded, "Okay, we've got to figure out what is going on because this is very weird. So I'm sorry, but you're going to have to bear with us a little bit."

Detective Morgan asked Park to restate what had happened. Park reiterated her claim that she had fallen asleep in the living room and then awakened to find Nam tied up in the study and unresponsive. She again said she couldn't remember what part of Nam had been tied to the chair or if anything was on Nam's neck when she found him. She denied pulling a rope off Nam's neck. Again, Park sought access to her cell phone.

About twenty minutes after he had arrived, Detective Morgan explained,

> Okay, so here's the deal. . . . We don't know what happened here in the apartment, okay, and we need to figure that out, alright. So if it's just you and him in here or something else happened, we need to know what happened here. For us to do that properly, we probably need to take you down to the station so that we can come

and take pictures and collect evidence and whatnot in here and make sure we're not missing anything.

Park asked why she couldn't go to the hospital. Detective Morgan said she couldn't because she had been the only person in the apartment with Nam as far as the police knew and was the only person who had information. Detective Morgan said that even if she were at the hospital, she would not be able to see Nam because they would be working on him.

The officers asked Park to accompany them to the West Des Moines police station and explained that they would be sitting down and talking to her there. Park agreed to this, but she asked to change her clothes first because she was in nightclothes. Detective Morgan told her she could get a coat and shoes but she couldn't change clothes because "everything in here is potentially evidence." He added that a change of clothes could be brought for her to the station. Detective Morgan explained, "We don't know what's important and what's not."

**C. February 15–16 Nighttime Interview at the West Des Moines Police Station.** Park received *Miranda* warnings when she reached the West Des Moines police station around 8:30 p.m. She did not sign the written *Miranda* waiver though.[1] The police by then knew that Nam had died, but they did not disclose that to Park. Instead, Detective Morgan told Park that the doctors were "trying to

---

[1]Park clearly understood the *Miranda* warnings. Relatively early in the interview, she said, "[S]hould I wait for that lawyer" Detective Morgan responded, "That's up to you." Later in the interview she said, "You said I have a right to remain silent." Detective Morgan responded, "Yes, you do." Park continued talking. Toward the end of the interview, Park reiterated, "You told me I can remain silent," and Morgan reiterated, "You have that option."

help him." Detective Morgan and another detective, Jason Hatcher, questioned Park well into the early morning of February 16.

Providing a lengthy narrative interrupted by occasional questions, Park stood by her earlier story that Nam had tied himself up. Park was able to fill in many details but still could not recall where she had found the ties on Nam.

About an hour into the interview, Park added something new. She said that Nam had asked her to tie him up a few days before—but not on February 15—so he wouldn't hurt her. Park disclosed that she had a video of this on her cell phone, but she reiterated she had not tied up Nam *that evening*.

About an hour and fifteen minutes into the interview, Detective Morgan said,

> It makes sense for him to say, "I don't want to hurt you either. So if I'm real upset, tie me up until I calm down because I don't want to hurt you," alright. So we just want to make sure, you know, if, if something happened today and then somehow he got hurt, that's okay, you know. If you didn't mean for him to get hurt. If it was his idea to get tied up and something happened, you know, that's fine. We just need to know.

Some ten minutes later, Detective Morgan revealed to Park that Nam had in fact died. Park sobbed uncontrollably and could not answer questions for a considerable time. The detectives declined Park's request to go see Nam, stating that evidence was still being gathered from his body.

At this point, the detectives confronted Park with their understanding of the physical evidence. Detective Morgan stated, "He was tied up, and he has marks on his neck like somebody strangled him." Detective Hatcher explained that the doctor reported that Nam "had died of strangulation," and they were

"trying to figure out . . . how he died of strangulation." Detective Hatcher also indicated that the officers were there to "help" Park and that Park was "safe in here." Detective Morgan suggested that what happened to Nam could have been an "accident."

Detective Morgan said that if Park had been strangled by Nam to the degree she passed out (as she had earlier claimed), "Nobody deserves that. It's not your fault, you know, you didn't deserve for him to treat you that way."

As the night wore on, Park continued to insist that Nam had tied himself up. The officers told Park repeatedly that this could have been a case of her protecting herself from physical abuse at Nam's hands. At one point, Detective Hatcher bluffed Park, telling her that Nam had discussed what had happened to him on the way to the hospital. The bluff didn't elicit a response.

Changing course somewhat, the detectives expressed disbelief at Park's claim that Nam had previously allowed her to tie him down so he wouldn't beat her: "If he's beating you, I don't see him stopping to say, . . . tie me down so I don't beat you anymore. That . . . doesn't make sense to me." Park pushed back, stating, "I feel like whatever I say, you want to blame me."

As the questioning continued, Detective Morgan told Park that if she took things into her own hands because she was getting abused, she should tell them because "people would understand that." Specifically:

> A woman gets beaten, she's getting abused by her husband, something happens, she takes it into her own hands. She poisons him. She does something to make it stop, to make it go away, and people get that. They relate[] to it. They understand. Now if I was getting treated like that, I would do something too. I would do

something to make it stop. So if that's the case, tell us that because people would understand that.

Park continued to stand by her account. She also told the detectives that she could not remember the passcode to her cell phone.

After a lengthy break that started around 12:30 a.m., the detectives returned for further questioning at about 1:45 a.m. The detectives told Park that they had been to the apartment and reiterated that "the information that you're telling us doesn't match up with the information we're finding at your house [or] [t]he information on your husband's body at the hospital." After about fifteen more minutes, Park asked for an attorney, and questioning ended. The officers informed Park that they had a warrant to search Park's cell phone and requested her again to give the code or to do facial recognition. She repeated that she didn't remember the code. She covered her face so as not to cooperate with the facial recognition feature of the phone.

At the close of the interview, Detective Morgan said, "We know you are lying to us. And we will do our job to prove you are lying to us. You're lying about everything." Detective Hatcher said, "Now it's our job to put everything together, and we'll do that." Detective Morgan added, "This is not going to be the last time you'll see us."

**D. February 16 Midday Interview at the Police Station.** About eight hours after her previous interview, Park returned to the police station unannounced on her own. Detectives Hatcher and Morgan were summoned and

again conducted the questioning. They Mirandized Park at the beginning of the interview. This time, she signed the *Miranda* waiver.

Park was more composed than the night before. She gave the detectives the code for her cell phone and said she was returning because she had not told the police everything earlier. She recounted a new version of the previous day's events.

Park claimed that Nam had been very upset while they were driving together the day before and broke the mirror of his car. When the couple returned to the apartment, Park claimed that Nam asked to be tied up so he wouldn't break something else or hurt himself. Park used zip ties and rope to restrain him. She said she tied the rope around his neck after putting a towel on him.

According to Park, Nam also asked to have his mouth duct-taped so he wouldn't scream; Park did that as well. Park added that she put a sock in Nam's mouth so he wouldn't bite himself. Park claimed to have covered Nam's eyes with a towel and duct tape because he had been banging his head on the table and she didn't want him to hurt himself.

As before, Park informed the detectives that she had moved from the study to the living room. Allegedly, when she later returned to check on Nam, the chair had tipped forward onto the ground, Nam was leaning forward on the ground, and he was not breathing.

Park again said there was a video on her phone from the time earlier in the week when she had tied up Nam at his behest.[2] Park claimed it had been Nam's idea for her to restrain him during his outbursts so she could "control" him; she advised Nam she didn't want to do it because it "sounded like a crime."

At the detectives' request, Park physically demonstrated on Detective Hatcher how she had tied up and bound Nam with the zip ties, rope, duct tape, and socks.

The officers asked for additional specifics relating to Nam's physical abuse of Park, which Park provided. Detective Morgan said, "You're a battered woman." But this time the officers did not mention that they were there to "help" Park.

After about one hour and forty minutes, Detective Morgan advised Park that they were going to step out for a while and talk to their supervisor. Park asked if she was going to be arrested that evening. The detectives responded that they were going to discuss it.

The officers returned about forty-five minutes later. Detective Morgan told Park that an autopsy on Nam was scheduled in two days—for Tuesday, February 18. He said the police also wanted to examine Park's phone and computer, and the person to do this would not be available until Tuesday. Detective Morgan advised Park that the detectives would contact her late Tuesday. Park told the

---

[2]As it turned out, there was also a video on Park's phone from 5:06 p.m. on February 15. In that video, Nam appears to be in considerable distress and demanding to be untied. Park tried to delete that video at 6:44 p.m., just two minutes before she called 911.

detectives that she wouldn't be leaving her apartment and that she didn't consider herself safe to drive.

**E. February 18 Interview at the Apartment.** As promised, Detectives Hatcher and Morgan arrived at Park's apartment late afternoon on February 18. But they were there to conduct an additional interview. Detective Hatcher explained that it was still "an active investigation," so they needed to re-read Park her *Miranda* rights to continue talking. Park signed the *Miranda* form. This interview lasted approximately an hour.

The three remained in the living room for the majority of the questioning. The detectives said that the autopsy had been performed, but they were waiting on toxicology that would determine, for example, if Nam had any foreign substances in his body at the time of death.

When the detectives started to inquire about Nam's possible drug usage, Park began to cry and rock back and forth. She kept repeating, "I feel really bad." Detective Morgan told Park to take her time because "some of this stuff is hard to talk about."

Park began describing Nam's past drug and alcohol use; she said he used to struggle with substance abuse including marijuana and cocaine in his college years, but she hadn't seen him use illegal drugs in the apartment. Park paused to take a medication of her own, which she said was prescribed for a stress-induced heart irregularity.

The detectives asked Park if she had ever sought medical treatment because of Nam's abuse. This questioning sparked a long series of responses

from Park. She said she had sought treatment two previous times: once when Nam allegedly threw a lamp at her, and another time when she suffered a broken thumb. She provided the detectives with medical files that had been sitting on her living room table.

Without prompting, Park next handed over what she characterized as a notarized document signed by Nam explaining his abusive behavior. Park interjected that her mom had been worried because Nam had threatened to kill her. Detective Hatcher said that he found that abnormal, saying he'd never heard of someone preparing and signing a notarized statement to explain their own abuse.

This shifted the conversation back to Park's cell phone video. Park told the detectives that Nam had memory issues and would engage in "weird behavior," like falling asleep in a loud restaurant. She said she would video this behavior per Nam's request so she could show him later when he had a "clean mind." The videos were not meant to be shown to a third person.

Later, the detectives said they wanted to reenter the study to examine it further. At first, they did not allow Park to follow them, though. Park joined the detectives a few minutes later without objection and began pointing out items around the apartment that Nam had allegedly broken. Park also provided a notepad and other documentation where Nam had allegedly admitted abusing Park.

Park asked, "So, what's going to happen now?" Detective Morgan reiterated that the police were still waiting on toxicology information. He added that they would be examining her cell phone, which they had not yet accessed.

The interview happened to take place on Park's birthday. Detective Hatcher said, "It's a pretty crappy birthday, but you know what, you're safe now." The detectives indicated that they would check back with Park in the next day or two. The interview concluded with Park requesting help opening her car's trunk, which had been frozen shut. The detectives walked out of the building with Park, assisted her with her car, and then departed.

**F. February 19 Interview at the Police Station.** The next morning at around 9 a.m., Park appeared on her own at the police station. Detective Hatcher greeted her and guided her to an interrogation room. Park was not read her *Miranda* rights.

Detective Hatcher started the interview by asking, "What can I do for you?" Park replied by pulling out a handwritten sheet of notes that she had prepared. She explained that ever since Nam had died, she had been unable to sleep. Referring to Nam's death, she said, "I really want to know why." Park stated that she had used the nighttime to prepare notes.

As Park began taking Detective Hatcher through her notes, he summoned Detective Morgan via text. Park stated that Nam would physically abuse her but that she wouldn't report it because Nam had threatened to end his life if anyone found out. Park asserted that Nam would often calm down after assaulting her. Detective Hatcher asked, "You're saying you loved him so much you're willing to

take a beating so long as he's getting better?" Park told Detective Hatcher, "I know it sounds really crazy." He replied, "It doesn't."

Detective Hatcher asked Park if Nam would ever slam her head against the wall. Park said yes, and she demonstrated how Nam would allegedly lift her by the neck and push her against a wall. She said that she occasionally passed out from this abuse.

Forty-five minutes into the interview, Park gestured to her notes and indicated that she had relayed what she intended to tell the detectives. Detective Hatcher asked, "What's your plan from here on out?" Park replied, "That's what I want to ask you. What's going to happen?" Detective Hatcher answered that they were still waiting on autopsy reports.

When another ten minutes had passed, Detective Morgan entered the interrogation room. Detective Hatcher summarized the prior discussion for Detective Morgan's benefit. Detective Hatcher then re-asked Park, "What do you have for us?" Park said she was shocked to hear about what the medical examiner had said. She asked by way of clarification, "So, he passed away because he couldn't breathe, that's it?" Detective Morgan replied, "We honestly don't know yet," and said that they were still waiting on the toxicology and the rest of the autopsy. Park asked, "After you get that [inaudible], what's next?"

The direction of the interview changed dramatically when Detective Hatcher asked Detective Morgan, "What do you want to do?" Detective Morgan turned to Park and said, "Let me be honest with you." He said that the preliminary findings from the autopsy showed that Nam had died by ligature

strangulation. As a result, the police did not believe that Nam killed himself. At 9:51 a.m., the detectives placed Park under arrest for murder and kidnapping.

**G. Procedural History.** On February 27, a trial information was filed in the Dallas County District Court charging Park with first-degree murder and first-degree kidnapping, both class "A" felonies. *See* Iowa Code § 707.2 (2020); *id.* § 710.2.

On October 22, Park filed a motion to suppress her statements made at the apartment and the police station from February 15 to February 19. Park raised four issues: (1) whether she was in custody at her apartment on February 15, (2) whether she knowingly, intelligently, and voluntarily waived her *Miranda* rights at her first interview at the police station on February 15–16, (3) whether the detectives made impermissible promises of leniency at that first interview, and (4) if there were promises of leniency, whether those statements tainted the subsequent interviews.

The district court held a hearing on March 2, 2021. Officers Sweeden and Hinrichsen and Detectives Morgan and Hatcher testified. The defense also called Dr. Silvia Asay, who has a Ph.D. in community and human resources and teaches at the University of Nebraska at Kearney. Dr. Asay testified that she has edited a book entitled *Family Violence from a Global Perspective* that includes chapters on domestic abuse in different cultures. She testified that Asian cultures are more patriarchal and tend to keep the existence of abuse private. She also testified that a Korean would be more likely to trust and give deference to an American police officer.

The district court later issued an order granting the motion to suppress in full. Regarding the first interview at the apartment on February 15, 2020, the court said,

> Based upon the nature of the questioning of Park, the officers' refusal to allow her to move about within the interior of the condo, the repeated denial of her requests to go to the hospital or place calls on her phone to arrange a ride to the hospital and the implication something "weird" was going on, the Court concludes Park was "in custody," despite the fact she remained in her own condo. While she was certainly not under arrest, there was significant restraint on her freedom of movement. Because she was not read her *Miranda* rights before questioning began, statements made by Park, whether inculpatory or exculpatory, must be suppressed.

(Footnote omitted.) Turning to the interview that night, the court concluded,

> Based on the totality of the circumstances existing at the time of the initial station house interrogation, the Court concludes the State has not met its burden. Based upon the nature and circumstances of the questioning, the Court is unable to conclude Park had a full awareness of both the nature of her *Miranda* rights and the consequences of a decision to abandon them. Most telling is her statement, "I'm not so sure," when asked if she understood her rights. Accordingly, Park's statements to officers at the police station on the night of the incident must be suppressed.
>
> . . . .
>
> Viewing the statements made to Park under the common law evidentiary test, the Court finds the assurances the officers gave her during the extended interview at the police station amounted to implied promises of leniency in exchange for her admissions. The circumstances and declarations of the officers were calculated to mislead Park as to her position and exert an improper influence over her mind.

Lastly, as to the subsequent February 16, 18, and 19 interviews, the court determined as follows:

> Having concluded Park's statements during the initial station house interrogation on February 15 & 16, 2020, were impermissibly induced, it is necessary to determine whether the illegality carried over to, and tainted, the subsequent interviews. Included in the factors to be considered are "the time that passes between confessions, the change in place of interrogations and the change in identity of the interrogators."

> . . . .

> Based upon the repeated nature of the implied promises and assurances the officers made to Park during their first station house interview with her, combined with the fact Park clearly articulated her desire to remain silent and to consult with counsel, the Court concludes the taint from the initial interview clearly carried over to all of the subsequent interviews conducted by the police officers.

(Footnote omitted.)

The State sought interlocutory review. We granted the application and transferred the case to the court of appeals. The court of appeals affirmed in part and reversed in part. The court reversed the suppression ruling as to the February 15 interview in the apartment, noting that Park had "initiated the encounter by calling 911." Additionally, the court reasoned that the officers questioned Park in her own home, where she was largely allowed to move about, and asked "open-ended questions [that] were not styled to elicit a confession," rather than confronting Park with evidence of guilt. In sum, the court said, "[A] reasonable person in Park's shoes would not have understood herself to be in custody during the first in-home encounter."

Yet the court of appeals upheld the district court's suppression ruling as to the remaining interviews. After a lengthy discussion, it concluded that Park did not voluntarily waive her *Miranda* rights at the West Des Moines police station on

the evening of February 15. Unlike the district court, which emphasized Park's decision not to sign the *Miranda* waiver and her perceived ambivalence in deciding to answer questions, the court of appeals focused on the detectives' deception regarding Nam's death as "the most salient factor in finding the *Miranda* waiver involuntary." The court of appeals also agreed with the district court that the detectives made improper promises of leniency. Finally, it agreed with the district court that the interviews on February 16, 18, and 19, should be suppressed under a "taint" theory because "minimal" time had elapsed and "the effect of the earlier promises had not dissipated."

The State applied for further review, and we granted the application.

**III. Standard of Review.**

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Hauge,* 973 N.W.2d 453, 458 (Iowa 2022) (quoting *State v. Brown,* 930 N.W.2d 840, 844 (Iowa 2019)). We review a district court's rulings on promises of leniency under the common law evidentiary test for correction of errors at law. *State v. Hillery,* 956 N.W.2d 492, 498 (Iowa 2021).

**IV. Legal Analysis.**

**A. Was Park in Custody During the First Interview at Her Apartment?**
The admissibility of the first interview turns on whether Park was in custody at her apartment on February 15, 2020. Law enforcement officers are required to give *Miranda* warnings to individuals who are both in custody and subject to

interrogation. *State v. Schlitter,* 881 N.W.2d 380, 395 (Iowa 2016), *abrogated on other grounds by State v. Crawford,* 972 N.W.2d 189 (Iowa 2022); *see also State v. Tyler,* 867 N.W.2d 136, 171 (Iowa 2015) (discussing warnings police must give based on *Miranda v. Arizona,* 384 U.S. 436, 471, 478–79 (1966)). Custody means there was "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322 (1994) (per curiam) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (per curiam)); *see also State v. Countryman,* 572 N.W.2d 553, 557–58 (Iowa 1997).

We apply an objective test: a person is in custody if a reasonable person in the defendant's position were to believe they were in custody. *Countryman,* 572 N.W.2d at 558. The test is based on "objective circumstances, not the subjective belief of the officers or the defendant." *State v. Bogan,* 774 N.W.2d 676, 680 (Iowa 2009). We assess the totality of the circumstances using four guiding factors in our determination: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *Countryman,* 572 N.W.2d at 558. We will consider each factor in turn.

We first consider the circumstances of how Park was summoned to the interrogation. The State contends that this factor weighs against custody because Park initiated the contact with the police, while Park counters that there was no clear advisory she was free to leave the scene.

"[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003) (alteration in original) (quoting *United States v. Griffin*, 922 F.2d 1343, 1351 (8th Cir. 1990)); *see also United States v. Parker*, 993 F.3d 595, 602 (8th Cir. 2021) (finding no custody where defendant called 911 for medical assistance, as "it is reasonable to expect that officers would talk to individuals at the apartment"); *State v. Smith*, 546 N.W.2d 916, 923 (Iowa 1996) (en banc) ("Although coming to [the interview] voluntarily is not alone enough to negate a finding of custody, it is indicative of the state of mind of a reasonable person in the situation.").

Park called 911 because she could not revive her husband. She was not summoned by the police. It is reasonable to expect questioning by responders arriving at a medical emergency. This factor weighs against custody.

We next consider the purpose, place, and manner of the interrogation. Generally, in-home interrogations are not custodial. *State v. Evans*, 495 N.W.2d 760, 763 (Iowa 1993) (en banc); *see, e.g., State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989) (finding that a person who was interviewed in his home and not under arrest was not in custody). But in *State v. Miranda*, we found that an individual was in custody despite the interview taking place in his home. 672 N.W.2d at 760. Although police in that case questioned the defendant in his living room, they did so while he was handcuffed. *Id.* Because "the usual comforts of home

were taken away from [the defendant]," we found that the "manner of the questioning belied its location." *Id.*

For the manner of questioning, we look to "how long it lasted, 'the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage.' " *Schlitter*, 881 N.W.2d at 396 (quoting *Tyler*, 867 N.W.2d at 172–73).

The State argues that *State v. Tyler* is analogous to the present case as to the purpose and manner of the officers' questioning. In *Tyler*, the demeanor and tone of the officers tipped the scale in favor of the defendant not being in custody. 867 N.W.2d at 173. There, a hotel employee had found the defendant's deceased child in a room; the police were sent to investigate the matter. *Id.* at 145–46. We noted that the officers "conducted themselves in a calm, respectful manner." *Id.* at 173. Assessing the situation, one officer stated, "We don't know what we got," and they repeatedly told the defendant they were only trying to gather information. *Id.* Instead of seeking a confession, they were trying to figure out what had happened. *Id.* Their intent "manifested in the manner of their questioning." *Id.* We found that, looking at the conduct and demeanor of the officers, a reasonable person would not have understood themselves to be in custody. *Id.*; *see also Smith*, 546 N.W.2d at 924 (examining whether a "confrontational and aggressive style" was used in questioning, or whether it felt "more relaxed and investigatory in nature").

We agree that *Tyler* is analogous. Here, the questioning at Park's apartment focused on determining what had happened, not on getting Park to confess to murder. The officers were calm, respectful, and sympathetic. At the beginning of the interaction, the officers were trying to console Park in her emotional state. At most points throughout the interaction, multiple officers were present, but the questioning was intermittent and generally conducted by only one officer at a time. Looking at the totality of the circumstances, we find that this factor weighs against custody.

Next, we turn to the extent to which Park was confronted with evidence of her guilt. Park says this factor is neutral; at most, she points to Detective Morgan's comment of "this is very weird." The court of appeals described this statement as a "frank appraisal of the situation rather than a comment on Park's guilt." *See Tyler*, 867 N.W.2d at 173 ("These questions were not accusatory in nature, but rather intended to encourage [the defendant] to tell the truth."). We agree; this factor is neutral.

The final factor is whether the defendant was free to leave the place of questioning. *Schlitter*, 881 N.W.2d at 397. "One element of this is the degree of physical restriction placed on the individual." *Id.* Courts look at exit paths, whether police officers were blocking the exits, the use of handcuffs or other physical restraints, whether officers tell the defendant they are free to leave, and if the defendant ultimately did leave the questioning. *See id.* at 397–98; *see also Tyler*, 867 N.W.2d at 174 (finding that the defendant was free to leave despite being in the police station where the door was unlocked and unobstructed and

officers told the defendant she could leave if she wanted); *Smith*, 546 N.W.2d at 925 ("One obvious factor we must examine is the degree of physical restraint imposed on the defendants during the interview process."). *But see Miranda*, 672 N.W.2d at 760 (finding custody where the defendant was in his home but was handcuffed to a chair, as "[t]o hold otherwise would wrongly suggest [the defendant] was free to leave while securely anchored to police property").

Park argues that because she was unable to enter the study or drive herself to the hospital, she was not free to leave the place of questioning. It is true that she could not enter the study. But this was to preserve the scene and any potential evidence it contained. And while Park was not permitted to drive herself to the hospital, this was because of her emotional state. The officers did not feel it was safe to allow Park to drive herself. Park didn't disagree. The officers presented Park with several options for requesting a ride. Park provided various excuses for why those proposals would not work. She insisted on getting access to her own cell phone to call for a ride.

The district court concluded that the officers "took control of Park" upon their arrival. Based on our independent review of the bodycam video, we would not characterize the situation that way. Two women police officers immediately attended to Park and tried to calm her down. They had no idea what had happened and were just trying to engage in conversation with her away from the frantic activity in the study, where paramedics were working on Nam and other police were evaluating the situation.

The district court also pointed out that Park's movement within the apartment was "restricted." But again, the restrictions related to the preservation of evidence. Park's highest priority seemed to be getting access to her cell phone, which of course was a potentially critical piece of evidence that the police wanted to preserve in its existing state. Although police temporarily denied Park access to the living room, it was only while the officers were photographing there.

The district court further noted that Park was told repeatedly "she couldn't go to the hospital 'now.' " But the reason given was that the officers still needed to understand this unusual situation, including information that might help Nam, and that she could go once they got that information. That was a logical explanation under the circumstances.

Finally, the district court noted that when the officers determined after about an hour that they were going to transport Park to the police station, they "further restricted her ability to move about" and wouldn't let her change her clothes. We agree that when Detective Morgan announced, "Okay, so here's the deal," things turned more custodial. And the State concedes that Park was in custody once she was actually being taken to the police station a few minutes later. Still, the State urges that Park wasn't technically in custody until she entered the patrol car because (1) she agreed to ride to the police station and (2) there was a valid evidentiary reason for not letting her change her clothes. We see no reason or need to cut such a fine line. We hold that statements made prior to Detective Morgan announcing, "Okay, so here's the deal," should not be suppressed.

**B. Did Park Waive Her *Miranda* Rights at the Police Station on the Evening of February 15–16?** The next issue is whether Park validly waived her *Miranda* rights after reaching the police station on February 15.

The detectives knew by this time that Nam had been pronounced dead at the hospital. But they lied and told Park they didn't know. Detective Morgan orally recited the *Miranda* rights and then presented Park with a written statement and waiver of those rights. Detective Hatcher added the following:

> This is a legal document that we present you to make sure that you understand your rights before you talk to us. Do we think anything happened suspiciously? We don't know. We have no idea what has transpired between you calling 911, your husband going to the hospital, or what happened before you called 911. We want to find out. We are kind of in a crunch to try to figure out what has happened. But we always bring something into this room and . . . these are your rights. So we read you your rights. We want to make sure you understand your rights. But we want to find out what happened and made your husband be in that position where you used scissors [to cut him free] and stuff like that.

Park asked if she could talk to the detectives later. Detective Morgan responded that the detectives want to talk now. He added that it would be fine if she didn't want to talk now but she would remain at the station. Detective Hatcher said that "we just want to figure out why Nam was in the position he was in; why he had the marks around his wrists and neck."

When asked, Park initially said she understood her rights. But when asked to confirm this a second time, Park said she wasn't so sure. Detective Morgan said, "If you don't want to sign that [form], that's fine, but we still want to talk to you." Questioning proceeded in a slow and deliberate fashion.

Park not only is fluent in English, but she also has advanced degrees from universities in the United States and has taught college-level classes in English since 2013.[3]

For a person to validly waive their *Miranda* rights, the individual must do so "knowingly, intelligently, and voluntarily." *Tyler*, 867 N.W.2d at 174. "The inquiry into whether a waiver is valid 'has two distinct dimensions.' " *State v. Hajtic*, 724 N.W.2d 449, 453 (Iowa 2006) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). First, the waiver must have been knowing and intelligent, which means that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009) (quoting *Moran*, 475 U.S. at 421). Second, the waiver must have been voluntary, which means that the waiver was "the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." *Id.*

To determine if *Miranda* rights were properly waived, we look at the "totality of the circumstances surrounding the interrogation." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *accord Ortiz*, 766 N.W.2d at 251. We use an objective standard. *Hajtic*, 724 N.W.2d at 453. The State has the burden of proof to show the waiver was valid. *Countryman*, 572 N.W.2d at 559.

---

[3]The district court stated that "her fluency is limited." Our independent review of the recorded interviews indicates otherwise. In fact, Park states that she is "fluent" in English on her resume, which she introduced as an exhibit.

While a written waiver "is not alone sufficient," it is "usually strong proof." *Id.* At the same time, failure to sign a written waiver is not dispositive, either. In *State v. Davis*, the defendant read the written *Miranda* waiver aloud and refused to sign it, but the defendant then talked to the police anyway and ultimately signed a statement. 304 N.W.2d 432, 433 (Iowa 1981). We held the defendant's statement admissible. *Id.* at 436. As we put it, "[W]e must examine this defendant's words and actions, after he was informed of his *Miranda* rights, to determine if in fact a waiver occurred." *Id.* at 435. "[W]aivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010).

The district court found that Park had not knowingly and intelligently waived her rights. The court of appeals concluded otherwise. On our review, we agree with the court of appeals. Although Park gave one "I'm not so sure" answer when asked if she understood her rights, the record indicates she understood them. About thirty minutes into the interview, when she was asked to draw a diagram showing how she found Nam before she called 911, Park interjected that maybe she should "wait for that lawyer." Detective Morgan said that was up to her, and she continued. Somewhat later, after Detective Morgan commented that "[w]e just want to know what happened," Park reminded him that "[y]ou said I have a right to remain silent." Detective Morgan confirmed that she did have

such a right and, again, the interview continued. Once Park invoked her right to counsel at around 2 a.m., the interview ended.[4]

We are not persuaded that Dr. Asay's testimony has much relevance here. She is not a psychologist.[5] Her background is on family dynamics, not police interrogation. Her dissertation was on "Family Strengths in Romania." We are not convinced Dr. Asay is an expert on South Korean attitudes toward police. Even if she were qualified, we wonder about the value of generalizations that a particular "culture" is "more likely to comply with requests from law enforcement" and therefore courts should be more reluctant to find that a person belonging to that culture has voluntarily and knowingly waived their *Miranda* rights. Would we allow prosecutors to engage in these kinds of generalizations on the other side? Clearly not.

As the court of appeals indicated, whether Park voluntarily waived her *Miranda* rights is a closer question. "For a waiver to be made voluntarily, the relinquishment of the right must have been voluntary, meaning it was the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." *Ortiz*, 766 N.W.2d at 251. Whether a waiver is voluntary does not depend on "moral and psychological pressures to confess." *Oregon v. Elstad*,

---

[4]Park argues that she invoked her rights to remain silent and to counsel *earlier*. We believe the record belies these assertions. Park sought confirmation that she had these rights and demonstrated her understanding of them; she did not invoke them. *See State v. Hicks*, 791 N.W.2d 89, 94 (Iowa 2010) (noting that United States Supreme Court precedent "requires the suspect to make an unequivocal or unambiguous request for counsel to invoke his Sixth Amendment right").

[5]Dr. Asay did not offer a forensic opinion and testified she was not qualified to do so.

470 U.S. 298, 305 (1985). Rather, "voluntariness of a waiver of this privilege has always depended on the absence of police overreaching." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). " '[V]oluntariness' for . . . due process purposes and *Miranda* purposes are identical." *Countryman*, 572 N.W.2d at 559. "The ultimate test is whether, under the totality of circumstances, the statements were the product of an essentially free and unconstrained choice, made by the subject at a time when that person's will was not overborne or the capacity for self-determination critically impaired." *State v. Bowers*, 656 N.W.2d 349, 353 (Iowa 2002).

The court of appeals determined that Park's waiver, while knowing and intelligent, was not voluntary because the detectives "used trickery to get Park to talk." Yet in *State v. Cooper*, an assistant county attorney used the same trickery, telling the defendant that he did not know the victim's condition when he in fact knew the victim had died. 217 N.W.2d 589, 597 (Iowa 1974). We nonetheless decided that the defendant's confession was admissible. *Id.* We noted that the basic question was not whether the defendant had been tricked, but whether he had been "tricked into waiver of his constitutional rights." *Id.* at 595. Deception was only a factor to be considered in the totality of the circumstances. *Id.* at 596–97.

Here, the court of appeals distinguished *Cooper* on the ground that "[t]he detectives wove their false assertions about the condition of Park's husband into their reading of Park's *Miranda* rights, and they repeatedly underscored the urgency of speaking to them in order to facilitate his treatment." This is a

significant point, but we ultimately believe it does not demonstrate that Park's statements on the night of February 15–16 were involuntary. While the detectives used deception about Nam's condition, they used no deception about exactly what they were looking for: information on how Nam ended up with ligature marks on his wrist and neck.

Crucially, we disagree with the court of appeals that the detectives' trickery "g[ot] Park to talk." Park was willing to talk about how Nam ended up bound and tied to a chair from the get-go. Her answers in that regard didn't change until midday February 16, when she returned for the third interview, well after she knew that Nam had died. "[A] *Miranda* waiver is involuntary only when it is shown to be *the product* of police misconduct or overreaching." *Tyler*, 867 N.W.2d at 174 (emphasis added) (quoting *Countryman*, 572 N.W.2d at 559). "The relinquishment of the right must be voluntary, that is it was not given *as a result of* intimidation, coercion, or deception." *Countryman*, 572 N.W.2d at 559 (emphasis added).

The detectives' deception may have been distasteful, but it didn't cause Park's waiver of her *Miranda* rights. *See Moran*, 475 U.S. at 422–23 ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.").

Likewise, the officers' reassurances didn't bend Park either. Park stuck to her story during the night of February 15–16 even as the detectives told her they

were there to "help" her; that people would understand her taking matters into her own hands if she was getting abused; that accidents happen; that if Nam got hurt, and she didn't mean for him to get hurt, that's fine; and that she was "safe" at the police station.

We also do not find the questioning of Park to be overbearing given her physical and emotional state. It is true that Park was kept at the police station until the early morning hours of February 16. Overall, she was subjected to about three and a half hours of questioning. She became extremely distraught and cried uncontrollably and repeatedly upon being told of Nam's death around 10:15 p.m., but she recovered and continued to answer questions. She was given water and there were breaks in the questioning.

On our de novo review, we conclude that Park knowingly, intelligently, and voluntarily waived her *Miranda* rights at the West Des Moines police station on the evening of February 15–16.

**C. Did the Detectives Make Impermissible Promises of Leniency During the Interview at the Police Station on February 15–16?** Our court's approach toward deceptive promises of leniency is generally stricter than its approach toward deception. With promises of leniency, we apply a "per se exclusionary rule"; with other forms of deception, we examine the totality of the circumstances as part of the voluntariness inquiry. *State v. Madsen*, 813 N.W.2d 714, 724–26 (Iowa 2012). Federal courts, by contrast, apply the same totality-of-the-circumstances test in both instances. *See id.* at 724. Thus, our court, instead of considering whether the promise of leniency induced the confession, looks at

whether the language itself would be "likely" to cause a false confession. *Hillery*, 956 N.W.2d at 499; *State v. Howard*, 825 N.W.2d 32, 40 (Iowa 2012). We ask, "Will the statements by the interrogating officer likely cause the subject to make a false confession?" *State v. Mullin*, 85 N.W.2d 598, 602 (Iowa 1957). Otherwise stated, is the promise such as would create a "fair risk of a false confession"? *Madsen*, 813 N.W.2d at 725 (quoting *Mullin*, 85 N.W.2d at 601).

Despite repeated attempts by the State to get us to abandon this common law evidentiary test, we have adhered to it. *See Hillery*, 956 N.W.2d at 499; *Madsen*, 813 N.W.2d at 724–26; *State v. McCoy*, 692 N.W.2d 6, 27 (Iowa 2005). We therefore apply it here.

We found improper promissory leniency in *State v. Madsen*. 813 N.W.2d at 722. There, a detective—while questioning the defendant about sexual misconduct with certain boys—indicated through his questioning that the matter would "go away," "be done with," and not be in the local newspaper if he "[came] clean on everything." *Id.* at 718–19. About twenty minutes after the comment about appearing in the local newspaper, the defendant admitted to additional acts of sexual misconduct with the boys who would visit his apartment. *Id.* at 719. Applying the evidentiary rule, we found that the detective's statements implicitly conveyed the message that the defendant could avoid public charges against him by confessing. *Id.* at 722. Accordingly, we found that the statements made after the promises of leniency should have been suppressed had the defendant's counsel properly raised the issue before trial. *Id.* at 727.

In *State v. Howard,* we also found a detective's line of questioning crossed the line into an improper promise of leniency. 825 N.W.2d at 34. The defendant there was suspected of sexually abusing his toddler son. *Id.* at 35. In the interview, the defendant initially reported that he did not know what caused the child's injuries, but he suspected it was caused by a hard stool. *Id.* As the interview continued, the detective discussed the proper punishment for someone who abuses a child. *Id.* at 36. The detective first got the defendant to say, hypothetically, someone who was sick and sexually abused a small child because they couldn't control themselves should be hospitalized until they complete treatment. *Id.* He then asked the defendant, "How do we get the help, get you the help you need?" *Id.* Although the defendant continued to deny that he had abused the child, as the interview proceeded, the detective repeatedly referred to the "help" available for people who sexually abuse children. *Id.* at 36–37. The detective said that there were doctors and nurses who can help treat people with this sickness and that people go to a treatment center "like people go to treatment centers for drug addictions." *Id.* at 37. He asked the defendant about his future, and "how do we get from here to there?" *Id.* The detective then promised,

> You know that no matter what you tell me today, I'll give you a ride home, drop you off, wherever you want to go as long as we can promise that [the child's mother] and [the child] can [be] safe . . . and you're not going to contact them until we know that [they] are going to be safe and you get the help you need, okay. I'll give you a ride wherever you want to go, okay? . . . So what happened?

*Id.* at 38 (third alteration and first omission in original). The defendant thereupon confessed to sexual abuse. *Id.* Soon after, the defendant was charged with

second-degree sexual abuse and child endangerment causing bodily injury. *Id.* On our review, we held that the defendant's confession was inadmissible. *Id.* at 41.

Also, in *State v. Polk*, we held that the police officer had crossed the line. 812 N.W.2d 670, 676 (Iowa 2012). There, after the jailed defendant had refused to answer further questions and asked to go back to his pod, the officer told the defendant that "if somebody cooperates with us, on down the road the county attorney is more likely to work with them." *Id.* at 675. The officer reinforced this message repeatedly and then added the message that the defendant would get to spend more time with his children if he confessed. *Id.* at 675–76. The defendant then admitted he had taken his gun to the scene and fired it at the defendant. *Id.* at 676. We held this promise of reduced time in return for a confession rendered the confession inadmissible. *Id.*

Park analogizes her case to cases like these. We see a difference, though. In *Madsen*, *Howard*, and *Polk*, the officers misled the defendants as to the future disposition of their cases in a specific, concrete way: promising either no incarceration, treatment in lieu of incarceration, or reduced incarceration. We think it is appropriate to zero in on the actual statements alleged to be promises of leniency.[6]

---

[6]The district court acknowledged,

> This is not a case where the police interrogators made an express promise of leniency. At no time did the police specifically tell Park that she would receive some preferential treatment if she talked to them. The officers did not specify any advantage to be gained from making a confession.

Detective Morgan told Park that if she was abused, "It's not your fault, you know, you didn't deserve for him to treat you that way." That is a true statement. It is not the victim's fault when they are abused by a domestic partner.

Detective Hatcher told Park that she was "safe" with them at the police station. That is also a true statement.

Detective Morgan told Park that if a woman is abused and does something to make it stop "people get that . . . [;] [t]hey understand." At the level of generality at which it was made, this statement is true. It does not imply a specific legal outcome. In any event, in a recent case, the State conceded that evidence of battered woman's syndrome (BWS) would likely have been admissible at a criminal trial where the defendant was convicted of first-degree murder for shooting her domestic partner. *Linn v. State*, 929 N.W.2d 717, 752 (Iowa 2019). In that same case, we noted, "Every jurisdiction accepts expert BWS testimony to support claims of self-defense." *Id.* at 748. So jurors potentially would consider Nam's prior physical abuse of Park at trial, if such abuse occurred.

Detective Morgan added that if he "was getting treated like that [i.e., physically abused], [he] would do something, too." But he didn't say that he would kill his partner or that the killing would go without legal consequence.

Detective Morgan also repeatedly asked Park if it was an "accident." He said the officers needed to know if she tied up Nam and if something happened "accidentally" to cause his death. In context, we do not see any promise of leniency even if it was an accident. The inquiry strikes us as a legitimate one. Park had not given any explanation for Nam's strangulation on the night of

February 15–16 other than the improbable story that he had tied himself up. Maybe it was an accident.

Lastly, Detective Hatcher told Park several times that the officers were there to "help" Park. That statement was probably *not* true. The detectives were not there to help Park, any more than the detectives were truly interested in wishing Park a happy birthday three days later. But such a general statement falls far short of a promise of leniency that might extract a false confession.

Thus, we conclude the statements made by the detectives were not likely to cause a false confession and did not cross the line into improper promissory leniency. Under the common law evidentiary test, when "there is no dispute as to the words used" or their meaning under circumstances, the court determines the issue as a matter of law. *Polk*, 812 N.W.2d at 674 (quoting *Mullin*, 85 N.W.2d at 601). Here the statements in question were captured on video, which allows us to review both what was said and the context. Because the State has shown that Park knowingly, intelligently, and voluntarily waived her *Miranda* rights, and because the detectives' statements did not amount to improper promissory leniency, we hold that the February 15–16 interview should not have been suppressed.

**D. Should the February 16, 18, and 19 Interviews Be Suppressed as Tainted by the February 15–16 Interview at the Police Station?** The district court and the court of appeals both concluded that the taint from the improper interrogation on February 15–16 required the subsequent interviews to be suppressed. *See State v. Kase*, 344 N.W.2d 223, 226 (Iowa 1984). Because we do

not find that the February 15–16 interview should be suppressed, and because no independent objection was raised to those interviews, we reverse this determination.

* * *

We have discussed the details of Park's interviews, but we also think it is appropriate to add some observations on the big picture. Park comes across on the videos as an intelligent person who, although clearly distraught, realized that she might be in legal jeopardy and who sought to control the narrative from the time she called 911. Two of her five interviews, in fact, took place after Park showed up at the police station on her own and unannounced. The detectives may have been deceptive as to how they felt about Park, but they were quite open with Park that aspects of her story didn't make sense to them. Meanwhile, Park's explanations seemed to evolve, not in response to what the detectives told her, but as Park became increasingly aware that law enforcement would be able to obtain potentially incriminating evidence from her cell phone. Unlike the district court and the court of appeals, we find no legal thresholds were crossed here. In the end, our reaction is that the police's questioning was prolonged and somewhat improvised given the odd circumstances of Nam's death, but that it was not unduly overpowering or impermissibly misleading.

**V. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals. We reverse the district court judgment suppressing Park's statements, and we remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except Waterman and May, JJ., who take no part.